Richard M. Garbarini (RG 5496)
GARBARINI FITZGERALD P.C.
250 Park Ave, 7th Floor
New York, New York 10177
Phone: (212) 300-5358
Fax: (888) 265-7054

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

JOHN EMANUELE and CHARMING BEATS LLC,

                    Plaintiffs,

         v.

HELPMAN PRODUCTIONS, LLC, and HITMAN PRODUCTIONS, LLC,

                    Defendants.
-------------------------------------------------------------x

Case No.: 22-cv-385

**ECF CASE**

**COMPLAINT AND JURY DEMAND FOR DAMAGES FOR COPYRIGHT INFRINGEMENT**

Plaintiffs JOHN EMANUELE and CHARMING BEATS LLC, by and through the undersigned counsel, bring this Complaint and Jury Demand against defendants HELPMAN PRODUCTIONS, LLC and  HITMAN PRODUCTIONS, LLC for damages based on copyright infringement and related claims pursuant to the Copyright Act and Copyright Revisions Act, 17 U.S.C. §§ 101, et seq. ("the Copyright Act" or "Act").  Plaintiff alleges below, upon personal knowledge as to themselves, and upon information and belief as to other matters so indicated.

**JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1338(a) (jurisdiction over copyright actions).

## GENERAL AND SPECIFIC JURISDICTION

2.      Defendants are domiciled in Brooklyn, NY and are subject to the jurisdiction of this Court.

## VENUE

3.      At bar, a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District and venue is proper pursuant to 28 U.S.C. § 1391(b)(1)-(3).

## DUE PROCESS

4.      There are no due process concerns in light of the fact that defendants reside in this Judicial District.

## PARTIES

5.      Plaintiff CHARMING BEATS LLC is a limited liability company organized under the laws of Florida with a headquarters located at 75-10 197th St, 2nd Floor, Flushing, NY 11366.

6.      Plaintiff JOHN EMANUELE is an individual and resides at 75-10 197th St, 2nd Floor, Flushing, NY 11366.

7.      Upon information and belief, defendant HELPMAN PRODUCTIONS, LLC ("HELPMAN") is limited liability company organized under the law of the State of New York with a primary headquarters located at 145 Jackson St. Apt. 1B, Brooklyn, NY 11211.

8.      Upon information and belief, defendant HITMAN PRODUCTIONS, LLC ("HITMAN") is limited liability company organized under the law of the State of New York with a primary headquarters located at 145 Jackson St., Apt. 1B, Brooklyn, NY 11211.

**FACTS**

9.      Plaintiff Charming Beats is the sole owner by assignment of the original musical compositions and recordings titled: "*Anything You Synthesize*" - U.S. Copyright Registration No. SR 713-287; "*Anything You Synthesize (Ambient)*" - U.S. Copyright Registration No. SR 713-314; and, "*Palestine*" - U.S. Copyright Registration No. SR 713-228.  Plaintiff John Emanuele is the sole owner and author of the original composition and recording titled "*Ghostpark*" - U.S. Copyright Registration No. SR 677-965 (collectively the "Copyrighted Tracks"). See **Exhibit 1.**

10.      The two (and only) members of plaintiff CHARMING BEATS are the sole authors of the CHARMING BEATS Copyrighted Tracks.

11.      Defendants produce and distribute movies for theatrical release.

12.      Defendant HELPMAN produced and distributed a documentary titled Musicwood (the "Musicwood Film").  Defendant HELPMAN and defendant HITMAN publicly displayed, distributed, and publicly performed the infringing Musicwood Film.

13.      Maxine Trump and Josh Granger are the sole members and officers of both defendants.

14.      Defendant HELPMAN, without license or authority, reproduced and synchronized the Copyrighted Tracks to the infringing Musicwood Film.

15.      Defendants, without license or authority, publicly performed the infringing Musicwood Film at scores of film festivals, and distributed the Musicwood Film for sale through defendants' website, Amazon, iTunes, FHX and other platforms.

16.      Defendants also streamed the Musicwood Film for rent on Amazon and YouTube without license or authority.

17.     Defendants had no license or authority, at any time, to synchronize, publicly perform, publicly display, distribute, or reproduce plaintiffs' Copyrighted Tracks, and have infringed plaintiffs' rights pursuant to 17 U.S.C. § 106.

18.     Defendants also allowed the University of Minnesota to post the infringing Musicwood film on YouTube.

19.     Defendants could have removed the Musicwood Film at any time from YouTube, but elected not to do so in favor of financial gain.

20.     The Copyrighted Tracks are synchronized in their entirety to the infringing Musicwood Film.

21.     At no time did the defendants have the right to use the Copyrighted Tracks in any manner.

22.     On or about January 11, 2022, plaintiffs, through counsel, notified defendants of their infringing conduct and demanded they cease-and-desist. See **Exhibit 2**.

23.     Defendants refused to cease-and-desist.

24.     Despite several more demands, defendants continued to refuse to cease-and-desist.

25.     As of the date of this Complaint, the Musicwood Film is still active and available to the public on defendants' websites, Amazon, iTunes, and FHX, among others.

26.     Defendants' failure to comply with multiple demands to cease-and-desist evidences defendants' intent to infringe.

27.     There are no facts that would have allowed defendants to form a reasonable belief that they could reproduce, synchronize, publicly display, distribute, and publicly perform the

Copyrighted Tracks at the time the Copyrighted Tracks were reproduced and synchronized, and the infringing Musicwood Film was distributed and publicly performed.

28.     Defendants infringed plaintiffs' exclusive rights as set forth in Section 106 of the Act and their knowledge of the infringements.  Defendants' failure to comply with multiple demands to cease-and-desist satisfies the standard for enhanced damages set forth in Section 504(c) of the Act.

29.     Defendants' acts demonstrate the callous disregard the defendants have for their legal obligations, and only an award at the top of the statutory scale will serve to stop defendants from routinely violating the Copyright Act.

### THE FRAUDULENT LICENSES

30.     Defendants attempted to avoid liability by producing fraudulent licenses dated December 11, 2012 for three of the four Copyrighted Tracks (the "Hitman Licenses"). See **Exhibit 3**.  The Hitman Licenses were issued six months after defendants' infringing conduct began and a month after the final-cut of the Musicwood Film was distributed for theatrical release.

31.     Sometime in early 2012, defendants hired a new Music Supervisor, Brandon Mason ("Mason"), who supplied the Copyrighted Tracks for inclusion in the fine-cut of the Musicwood Film. Below is a screenshot from defendants' website located at <https://musicwoodthefilm.com/news/page/2/>.



32.     The screenshot on the prior page states, in relevant part "[w]e've put in a new temp music track — furnished for us by our new Music Supervisor — and the film is really feeling like it's coming together. Which is exciting! We're aiming to finish this August."

33.     Mason was the "new" Music Supervisor referred to by the defendants and the new tracks furnished by Mason were the Copyrighted Tracks.

34.     Defendants readily admit Mason was the Music Supervisor. See **Exhibit 4**.

35.     There was, of course, no licenses for the defendants' exploitation of the Copyrighted Tracks in June 2012.

36.     The infringing Musicwood Film debuted at the DOC NYC film festival on November 13, 2012.

37.     The 2012 DOC NYC film festival had a June 30, 2012 cut off for submissions to the festival.  Defendants finished the Musicwood Film, and were submitting it to film festivals six-months before the fraudulent Hitman Licenses were issued.

38.     Defendants admit they distributed the final-cut of the Musicwood Film to the DOC NYC film festival on November 6, 2012, for its premiere on November 13, 2012.  Below are screenshots from defendants' website.



39.     On November 13, 2012, the finished Musicwood Film was publicly performed at the DOC NYC film festival. See **Exhibit 5**.  Below is a screenshot from defendants' Facebook page.



40.     The Musicwood Film was publicly performed by defendants at another film festival on November 18, 2012.

41.     Defendants, without a license or authority, reproduced the Copyrighted Tracks, synchronized them to the Musicwood Film, distributed the infringing Musicwood Film, and publicly performed the infringing Musicwood Film.

## DEFENDANTS CONSPIRED TO VIOLATE PLAINTIIF'S RIGHTS

42.     Knowing the Copyrighted Tracks were not licensed when defendants distributed the Musicwood Film in November 2012, defendants enacted a fraudulent scheme to obtain licenses for the Copyrighted Tracks six months after defendants' infringing conduct began.

43.     In June 2012 (when Mason was hired by defendants), Mason had a small failing licensing company called Juxtaposed Music ("JuxMusic").  JuxMusic was only in existence for a little over a year and a half.

44.     In an unsolicited from Mason to plaintiffs dated April 28, 2012, Mason requested the opportunity to be a non-exclusive licensing representative for plaintiffs. See **Exhibit 7**.

45.     On May 1, 2012, plaintiff and JuxMusic (owned by Mason) executed a representation agreement whereby Mason claimed he would seek out licensing deals for plaintiffs' approval (the "Representation Agreement"). See **Exhibit 8**.

46.     Mason failed to identify any licensing deals for plaintiffs' tracks.

47.     On December 11, 2012, plaintiffs contacted Mason. See **Exhibit 9**.

48.     Mason replied by email at 5:39 pm on December 11, 2012 as follows:

> I am receiving a very large number of low-quality offers these days. Not quite sure what to do about it. After the first of the year I will make the rounds for some face time with my regular clients to see what adjustments need to be made.

See **Exhibit 9**.

49.     On December 11, 2012, defendants' employee Mason issued the fraudulent Hitman Licenses to defendant Hitman. See **Exhibit 3**.

50.     Defendants' employee Mason concealed the existence of the licenses from plaintiff in an attempt to conceal defendants' infringing conduct.

51.     Clause 2(b) of the Representation Agreement states:

> "JuxMusic hereby agrees to immediately notify Music Licensor via email or phone call of any and all secured synch placements."

See **Exhibit 8**.

52.     Plaintiffs were never informed by JuxMusic (Mason) of the Hitman Licenses.

53.     There were fifty-six emails between plaintiffs and Mason from April 28, 2012 to December 11, 2012.  There was only 1 email from December 12, 2012 to May 2013.

54.     Mason issued the fraudulent Hitman Licenses then disappeared.  At no time did Mason disclose the fraudulent Hitman Licenses.

55.     The payment terms of the fraudulent Hitman Licenses are well-below market value.

56.     For example, the current minimum cost for a one-year, Internet only, license for the Copyrighted Tracks "*Anything You Synthesize*" and "*Anything You Synthesize (Ambient)*" is $5,000.00.

57.     The Hitman Licenses were issued as perpetual licenses for just $250 each.

58.     Mason would send emails to plaintiff regarding purported licensing opportunity, and would request plaintiff submit tracks, if interested.  Not a single licensing opportunity ever went past this stage.

59.     Most opportunities sent by Mason to plaintiffs were in the $20,000-$25,000 range per track.  A few were as high as $80,000 per track, and one was in the $1,000-$5,000 range per track (for an independent film).

60.     It is inconceivable for an opportunity for $250 per track to even be presented to plaintiffs.

61.     Clause 3(a) of the Representation Agreement states:

> "JuxMusic shall pay Music Licensor sixty percent (60%) of all upfront synchronization and/or master use licensing fees."

See **Exhibit 8**.

62.     Plaintiffs were never paid anything, including royalties, for the Hitman Licenses.

63.     JuxMusic was purportedly closed by defendants' employee Mason a few months after the fraudulent licenses were issued. See **Exhibit 10**.

64.     Defendants and their employee Mason clearly conspired with each other concerning the fraudulent Hitman Licenses.  The licenses were issued to defendant HITMAN by defendants' employee after the Musicwood Film was released, at impossibly low rates.

### THE HITMAN LICENSES ARE UNENFORCEABLE

65.     Defendants claim they used attorney Christopher Perez as their counsel for rights clearance. See <www.imdb.com/title/tt2078686/fullcredits>.  Mr. Perez would have quickly surmised that half the music in the Musicwood Film was unlicensed.

66.     Mr. Perez is the same attorney that defended the validity of the Hitman Licenses despite the fact that he must have known the Copyrighted Tracks were unlicensed when the Musicwood Film was distributed.

67.     On December 11, 2012, Music Supervisor Mason issued the unsigned Hitman Licenses to his employers.

68.     Mason never disclosed to plaintiffs that he was working for defendants, nor did he disclose the existence of the fraudulent Hitman Licenses to plaintiffs, or pay any of the license fees to plaintiffs.

69.     The Copyrighted Track *Palestine* was never included in the Hitman Licenses.

70.     The Hitman Licenses were issued after the final-cut of the Musicwood Film was completed and after the infringing films theatrical release.

71.     The Hitman Licenses were issued to defendant HITMAN only.  It was defendant HELPMAN, however, that reproduced, publicly performed, and synchronized the Copyrighted Tracks without a license.

72.     At no time have defendants produced an assignment from defendant HITMAN to defendant HELPMAN.  Regardless, the Hitman Licenses do not permit the use by multiple parties, so only one defendant could even claim it was protected by the fraudulent documents.

73.     The Hitman Licenses provide at Clause 7:

> Licensee agrees to prepare accurate performing rights cue sheets and file with ASCAP no later than 30 Days after the sound mix of the motion picture.  Licensee Agrees to furnish JUXMUSIC A cue sheet of the motion picture within thirty (30) days after the first public exhibition of the motion picture.

See **Exhibit 3**.

74.     Defendants have never submitted a cue sheet to ASCAP, or any other rights agency, and exploited the Copyrighted Tracks in a manner that didn't conform to the fraudulent Hitman Licenses.

75.     There is limited right to stream the infringing Musicwood Film in the Hitman Licenses.  Streaming can only be done by entities that have a license with a performing rights society like ASCAP.  Defendants, however, streamed the infringing Musicwood Film from their website, and Amazon, which is beyond the scope of the fraudulent Hitman Licenses.

76.     Defendants infringed plaintiffs' exclusive rights to the Copyrighted Tracks, attempted to fraudulently obtain licenses six months after their infringing conduct began, and once the fraudulent licenses were procured, defendants didn't act within the scope of the fraudulent licenses.

77.     Plaintiffs were never notified or paid for the Hitman Licenses, because the plan clearly was to conceal defendants' acts of infringement, and if caught, claim the uses were licensed.

78.     Defendants infringed plaintiff's rights to the Copyrighted Tracks pursuant to Section 106 of the Copyright Act, and they cannot avoid liability through the cheap, fraudulent,

self-serving licenses issued by defendant HITMAN to itself, well after the Musicwood Film was released.

## DISCOVERY

79.     Defendants were very careful to hide the fact that they were infringing the Copyrighted Tracks.

80.     Only a serendipitous act exposed the defendants' scheme.

81.     In June 2021, the University of Minnesota uploaded the infringing Musicwood Film for streaming on YouTube.

82.     The infringing Musicwood Film was identified by YouTube's Content ID System, and the infringements were discovered by plaintiffs.

## DMCA VIOLATIONS

83.     Defendants did not include the Copyrighted Tracks' title, album name, author, label, and copyright owner (the "Copyright Management Information" or "CMI") in its Press Kit, on IMDB, or in any public forum which the defendants' distributed the infringing Musicwood Film. See, e.g., **Exhibit 11**.

84.     Defendants' motivation for concealing the CMI is obvious, defendants were attempting to conceal their infringing conduct by concealing all CMI from public forums.

85.     Defendants refused to provide the correct CMI even after it was served with multiple notices.

86.     Defendants' removal and/or failure to include any CMI, and to correct the CMI after notice, are separate violations of 17 U.S.C. § 1202 – the DMCA.  Each time defendants distributed the infringing Musicwood Film to a film festival, or failed to disclose the CMI in its Press Kit, or on websites like IMDB, they violated Section 1202 of the DMCA.

87.     Plaintiffs are entitled to up to $25,000 for each violation of the DMCA pursuant to Section 1203 of the DMCA, plus their reasonable attorneys' fees and costs incurred in this action.

## DAMAGE CALCULATION

### Actual Damage Calculation

88.     Plaintiffs are entitled to their standard licensing fee for each of the Copyrighted Track of $5,000 per year (Internet only) for the three years prior to this Complaint for a total of $60,000, plus the attorneys' fees and costs incurred in this litigation.

89.     Plaintiffs' actual damages calculation must be increased to include defendants' direct, and indirect, profit from its exploitation of the Copyrighted Tracks, in excess of plaintiffs' actual damages, plus the reasonable attorneys' fees and costs incurred in this matter.

90.     Defendants leverage the social media pages for the Musicwood Film to promote their other projects.  For example, defendants' Facebook page for the Musicwood Film is replete with advertisements for defendants' other film To Kid or Not To Kid.

### Statutory Damage Calculation

91.     In the event plaintiffs elect four enhanced statutory damage awards, the awards must be at the higher part of the statutory range based on the facts and circumstances in this matter.

92.     The calculation of copyright statutory damages for defendants' willful infringements starts at three times plaintiffs' compensatory damages for each award.

93.     Defendants' state of mind supports a much higher statutory damage award. Defendants have engaged in a policy and practice of infringement, and a nefarious scheme of fraudulent licenses to conceal their infringing conduct.

94.     Defendants' failure to cease the unlicensed distribution and public display of the infringing Musicwood Film, after numerous demands to cease-and-desist demonstrates defendants' state of mind.

95.     Defendants elected to continue their nefarious license defense, even after plaintiff demonstrated that one Copyrighted Track was not included in the fraudulent Hitman Licenses, and the licenses were issued after the infringing conduct commenced.

96.     The forgoing supports the fact that defendants' state of mind was willful at all times relevant to this Complaint.

97.     An additional substantial amount, subject to proof, should be included in the statutory damage award calculation as a deterrent effect necessary to discourage defendants from engaging in the acts described herein in the future.

98.     Each enhanced statutory damage award, in light of the forgoing, should be $125,000, plus plaintiffs' reasonable attorneys' fees and costs incurred in this matter.

## FIRST CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT

99.     Plaintiffs incorporate the allegations contained in the preceding paragraphs as if set forth here at length here.

100.    It cannot be disputed that the plaintiffs have valid, registered copyrights, and owns all rights to the Copyrighted Tracks.

101.    Defendants, without license or authority from plaintiffs, reproduced, publicly performed, distributed, publicly displayed, and synchronized plaintiffs' Copyrighted Tracks in their entirety.

102.    Defendants did the forgoing for the sole purpose of commercial gain.

103.    Defendants refused to cease-and-desist after multiple demands.

104.    Defendants' use of the Copyrighted Tracks was not for criticism, comment, news reporting, teaching, scholarship, or research.

105.    Defendants' use was not transformative.

106.    As a direct and proximate result of defendants' infringement of plaintiffs' exclusive rights to the Copyrighted Track as set forth in Section 106 of the Act, plaintiffs have incurred damages, and requests an award of defendants' profits in excess of plaintiffs' compensatory damages, and plaintiffs' compensatory damages, plus costs, interest, and reasonable attorneys' fees.  Plaintiffs may also elect to recover four statutory damage awards pursuant to 17 U.S.C. § 504(c)(2) for defendants' willful infringement of up to $150,000, but not less than $30,000 plus costs, interest, and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**VICARIOUS COPYRIGHT INFRINGEMENT**

107.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if set forth at length here.

108.    Defendants had the right and obligation to disable the infringing upload of the Musicwood Film by the University of Minnesota.

109.    Defendants had an obligation to remove the infringing content but elected not to do so.

110.    Defendants made this election in favor of the financial gain expected from the increased publicity for its other movies.

111.    At all times relevant to this Complaint, defendants had knowledge of, and directly aided, the third-party infringers.

112.    As a direct and proximate result of defendants' acts of vicarious infringement of plaintiffs' exclusive rights to the Copyrighted Tracks as set forth in Section 106 of the Act,

plaintiffs have incurred damages, and requests an award of defendants' direct, and indirect, profits in excess of plaintiffs' compensatory damages, and plaintiffs' compensatory damages, plus costs, interest, and reasonable attorneys' fees incurred in this matter.  Plaintiffs may also elect to recover four statutory damage awards pursuant to 17 U.S.C. § 504(c)(2) for defendants' willful infringement/reckless disregard of plaintiffs' exclusive rights of up to $150,000, but not less than $30,000 plus costs, interest, and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF DMCA OF 1998, AS AMENDED,
### 17 U.S.C. §§ 1201, et seq.

113.    Plaintiffs incorporate the allegations contained in the preceding paragraphs as if set forth at length here.

114.    Plaintiffs always distribute their copyrighted recordings and compositions, including the Copyrighted Tracks here, with copyright management information including the title, author, label, and copyright owner.

115.    Defendants failed to include any information which identified the Copyrighted Tracks, the author of the Copyrighted Tracks, the owner of any right in the Copyrighted Tracks, or information about the terms and conditions of use of the Copyrighted Tracks.

116.    Defendants violated the DMCA each time they wrongfully distributed the Musicwood Film with no CMI, withheld the CMI from their Press Kit, and failed to disclose the CMI to websites like IMDB.

117.    Defendants violated the DMCA each time they refused to correct the CMI after notice.

118.    Defendants clearly did the forgoing with the intent to conceal their infringing conduct.

119.    Plaintiffs seeks an award of statutory damages in the sum of $25,000 for each of defendants' violations of Section 1202 of the DMCA, plus the attorneys' fees, and costs incurred in this litigation.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment against defendants, and awarding plaintiffs as follows:

1.    restitution of defendants' unlawful proceeds in excess of plaintiffs' compensatory damages;

2.    plaintiffs' compensatory damages in an amount to be ascertained at trial;

3.    four statutory damages to plaintiffs according to proof, including but not limited to all penalties authorized by the Copyright Act (17 U.S.C. §§ 504(c)(1), 504(c)(2));

4.    an award of statutory damages for each violation by defendant of the DMCA, 17 U.S.C. § 1202;

5.    reasonable attorneys' fees and costs (17 U.S.C. § 505);

6.    pre- and post-judgment interest to the extent allowable; and,

7.    such other and further relief that the Court may deem just and proper.

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: January 22, 2022                         GARBARINI FITZGERALD P.C.
       New York, New York

                                                By: _Richard M. Garbarini_____

                                                     Richard M. Garbarini (RG 5496)